IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| MOUNTAIN VALLEY PIPELINE, LLC, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 7:20-cv-134 |
| ) | |
| 8.37 ACRES OF LAND, OWNED BY ) | By: Elizabeth K. Dillon |
| FRANK H. TERRY, JR., et al., ) |     United States District Judge |
| ) | |
|     Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mountain Valley Pipeline (MVP) is constructing an interstate natural gas pipeline. MVP commenced a condemnation action under the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, to acquire a permanent easement and temporary easements on numerous properties, including this property located in Roanoke County and owned by Frank Terry, John Coles Terry, and Elizabeth Terry. On March 7, 2018, the court entered an order in the primary condemnation case, *Mountain Valley Pipeline LLC v. Easements to Construct*, Case No. 7:17-cv-492 (W.D. Va.) (Dkt. No. 593), granting MVP immediate possession of the easement on this property. The trial of this matter is scheduled to begin on September 8, 2020.

MVP filed a motion to exclude defendants' experts (Dkt. No. 12), a motion to exclude the second report of defendants' expert Dennis W. Gruelle (Dkt. No. 13), and a motion in limine (Dkt. No. 14). At the hearing, MVP confirmed that it was withdrawing its initial motion to exclude defendants' experts. (Dkt. No. 12). After the hearing, defendants filed a supplemental motion for leave to file materials in opposition to MVP's motion in limine. (Dkt. No. 26.) For the reasons stated below, defendants' motion for leave to file supplemental materials will be granted; MVP's

motion to exclude Gruelle's second expert report will be granted; and MVP's motion in limine will be granted in part and denied in part.

## I.  BACKGROUND

MVP has condemned easements on the property owned by defendants, identified as MVP No. VA-RO-046.  On October 13, 2017, the Federal Energy Regulatory Commission (FERC) issued an order for MVP to construct, maintain, and operate a natural gas pipeline along a route that includes the Property (the Approved Route).  On October 24, 2017, MVP filed an action to condemn easements along the Approved Route on the Property (Easements) under Section 7 of the Natural Gas Act, 15 U.S.C. § 717f.  On October 27, 2017, MVP moved for partial summary judgment that it is authorized to condemn the Easements and a preliminary injunction granting immediate possession for construction.  On January 31, 2018, the court issued a memorandum opinion and order granting MVP's motion for partial summary judgment and conditionally granting MVP's motion for immediate possession upon a determination of appropriate security.  On March 7, 2018, the court set deposits and bonds for the Property and granted MVP immediate possession of the Easements effective upon making the required deposit and posting the required bond.

The subject property includes 560 acres on Poor Mountain Road in Roanoke County, Virginia.  The property is improved with a two-story farmhouse, a rental dwelling, garage, storage sheds, and an efficiency.  The property is accessed by a private driveway.

**A.  Gruelle's First Report – April 27, 2020**

In his initial expert report for defendants, dated April 27, 2020, real estate appraiser Dennis Gruelle notes that, in 2012, defendants entered a lease with Invenergy Wind for the development of a wind farm on the property.  (Dkt. No. 12-2 at 12.)  Gruelle concludes that the highest and best use of the property before the taking is "for the industrial development of a wind farm or solar farm."

2

(*Id.* at 13.) In his analysis of the value of the property after the taking, Gruelle states that "[a]fter MVP announced its project, the Invenergy Wind deal failed." (*Id.* at 26.) Because of this, Gruelle concluded that another wind farm project was not "reasonable or probable after the installation of the MVP project as the market actions of Invenergy demonstrate the incompatibility of underground easements and wind farming." (*Id.*) It appears now that Gruelle reached this conclusion without checking with Invenergy. Rather, as disclosed in the second report, two of the property owners blamed MVP for the termination of the lease, but Frank Terry "did not commit to any theory and guessed the issues did not relate." (Dkt. No. 13-1 at 36.) Therefore, Gruelle found that the highest and best use of the property after the taking is for a "single-family residential subdivision" or a "family subdivision." (Dkt. No. 12-2 at 26, 29.)

**B. MVP's Rebuttal Report – May 29, 2020, and Gruelle's Second Report – June 12, 2020**

In a rebuttal report served on May 29, 2020, MVP disclosed the expert report of April Montgomery, the Director of Site Development Services for SWCA Environmental Consultants. (Dkt. No. 12-4.) Contrary to Gruelle's assumption that a wind project was rendered impossible by the pipeline, Montgomery concluded that "a wind project on the Terry property is not negatively impacted by the construction of the Mountain Valley Pipeline." (*Id.* at 1.)

In response to the Montgomery rebuttal report, Gruelle issued a new report on June 12, 2020. (Dkt. No. 13-1.) In his new report and after checking with Invenergy, Gruelle reverses his opinion that the MVP project prevents development of the property as a wind farm. (*Id.* at 1.) In doing so, Gruelle finds that the highest and best use of only a portion of the property—the northern 323 acres of the property—is a wind farm, both before and after the taking. (*Id.* at 1, 37.) Gruelle states that he has now spoken with Invenergy and learned that the company abandoned the Terry lease for reasons unrelated to the pipeline. (*Id.* at 36–37.) Gruelle also admits to knowing

3

previously that defendant Frank Terry "guessed the issues did not relate." (*Id.* at 36.)

In finding that the highest and best use of the northern acreage is use as a wind farm, Gruelle gives a second new opinion—that the wind farm can be accessed by a fire road on an adjacent parcel of land owned solely by Elizabeth Terry, one of the three co-owners of the subject property. (*Id.* at 12.) Gruelle explains that the "lot lines" between defendants' property and the Elizabeth Terry tract can be adjusted. (*Id.* at 14.)

Gruelle further opines that the highest and best use of the southern acreage (237 acres) before the taking is use as a single-family residential subdivision and, after the taking, as family subdivision due to lack of frontage. (*Id.* at 15–16, 30–34.) This is contrary to his prior report, which found that the highest and best use of the entire property before the taking is as a wind farm or solar farm. (Dkt. No. 12-2 at 13–14.)

Gruelle opines that the improvements are not helpful to the wind farm, and they should continue to be used for residential purposes. (Dkt. No. 13-1 at 14.) In his prior report, Gruelle determined that the improvements should be used with the wind farm as offices and lodging for workers. (Dkt. No. 12-2 at 13–14.) Gruelle values the property and damages by separately determining the value of and damages to the southern acreage and the value of and damages to the northern acreage and combining the two values and damages. (Dkt. No. 13-1 at 40.) Finally, Gruelle, for the first time, finds that a high consequence area (HCA)[1] damages the property by 35%. (*Id.* at 37–39.)

---

[1] Defendants admitted at the hearing on these motions that there is no HCA on the property.

4

## II.  DISCUSSION

### A.  Legal Standards

The motions present various issues of just compensation in eminent domain cases as well as issues involving the timeliness of new expert witness opinions and the supplementation of expert witness reports.  Legal standards regarding the same are set forth herein.

#### 1. Just compensation for partial permanent takings, including severance damages

The Takings Clause of the Fifth Amendment prohibits the taking of private property without just compensation.  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005).  When the government condemns private property for a public purpose, it must pay just compensation for that property.  Just compensation is the monetary equivalent of the property taken, and the federal courts have employed the concept of "fair market value" to determine the condemnee's loss.  *United States v. 564.54 Acres of Land*, 441 U.S. 506, 510–11 (1979); *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74 (1973).

Unless otherwise proscribed by Congress, federal law governs "questions of substantive right, such as the measure of compensation" for federal courts in condemnation proceedings.  *United States v. Miller*, 317 U.S. 369, 379–80 (1942).  *See also Tenn. Gas Pipeline Co. v. Permanent Easement for 1.7320 Acres*, No. 3:cv-11-028, 2014 WL 690700 (M.D. Pa. Feb. 24, 2014) (unpublished) (concluding that federal law applies in determinations of just compensation under the Natural Gas Act).  The Fourth Circuit defines just compensation in a case of partial taking as "the value of the land taken plus the depreciation in the market value of the remainder."  *United States v. 97.19 Acres of Land*, 582 F.2d 878, 881 (4th Cir. 1978) (citing *W. Va. Pulp & Paper Co. v. United States*, 200 F.2d 100, 104 (4th Cir. 1952)).  Moreover, "value [of the condemned land] is to be ascertained as of the date of taking."  *Miller*, 317 U.S. at 374.

In *W. Va. Pulp & Paper*, the Fourth Circuit recognized the well-settled principle that "whenever there has been an actual physical taking of a part of a distinct tract of land, the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing, of course, injury due to the use to which the part appropriated is to be devoted." 200 F.2d at 102. The court recognized that the landowner was damaged not only by the loss of the land, but also by the proposed use that caused depreciation to the remainder, and therefore was entitled to be awarded a sum that "would put it in as good position pecuniarily as it would have been if its property had not been taken." *Id.* at 103. The measure of this sum was "the value of the land taken plus the depreciation in the market value of the remainder due to the use made of the part taken." *Id.* at 104. *See also 97.19 Acres of Land*, 582 F.2d at 881 (citations omitted) (explaining that severance damages to the remainder, if any, are measured as "the difference in market value of the residue before and after the taking").

### 2. Damages for perceived market negative influences

In a previous opinion, this court analyzed the law with regard to testimony about damages resulting from perceived market negative influences, such as the perceived danger, or unsafe nature, of pipelines. *See Mountain Valley Pipeline, LLC v. 1.23 Acres of Land Owned by Eagle's Nest Ministries, Inc.*, Civil Action No. 7:18-cv-00610 (W.D. Va.), Dkt. No. 55; *Mountain Valley Pipeline, Inc. v. 6.50 Acres of Land Owned by Sizemore Inc. of Va.*, Civil Action No. 7:18-cv-00612 (W.D. Va.), Dkt. No. 66. The court will not repeat that entire analysis here, but merely incorporates it by reference. By way of summary, the court held that, to be admissible, an expert's opinions with regard to some hazard incident to the use of the property taken must be supported by some evidence that the hazards are reasonably probable and more than just speculative. Moreover, there must be a

6

nexus between those hazards and/or the public perception in the marketplace—specifically, the marketplace for that property—and a diminution in value of the property. In other words, there must be a causal link between the hazard inherent in the taking and a direct loss in the marketplace. *United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1448 (9th Cir. 1984); *see also Atl. Coast Pipeline LLC v. 0.07 Acres*, No. 3:18-cv-00006, 2019 WL 2527571, at *14–17 (W.D. Va. June 19, 2019) (excluding an expert environmental professional's opinion about a natural gas pipeline's effect on property value because the analysis was not linked to the specific property's value and was therefore irrelevant to the determination of just compensation).

### 3. Expert reports and supplementation

Rule 26(a) requires an expert witness to submit a written report that contains "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them . . . ." The report "should be a comprehensive document that, by itself, provides all the expert's opinions that will be offered at trial, along with the bases for those opinions." *Samsung Elecs. Co. v. Nvidia Corp.*, 314 F.R.D. 190, 198 (E.D. Va. 2016) (citations omitted).

There are also rules governing "supplementation," which has a narrow meaning in this context and must be distinguished from "gamesmanship." *Disney Enters., Inc. v. Kappos*, 923 F. Supp. 2d 788, 795 (E.D. Va. 2013). Under the governing discovery rules, parties have a duty to timely supplement expert reports if they are "incomplete or incorrect" "in some material respect" and "the additional or corrective information has not otherwise been made known to the other parties . . . ." Fed. R. Civ. P. 26(e)(1)(A). The supplemental information is due no later than the

deadline for pretrial disclosures under Rule 26(a)(3)—so thirty days before trial. *Id.*; Fed. R. Civ. P. 26(a)(3).

Thus, supplementation is appropriate to "add or correct information," but a party may not use Rule 26(e) supplementation "whenever [it] wants to bolster or submit additional expert opinions" or it would "amount to unlimited expert opinion preparation." *Campbell v. United States*, 470 F. App'x 153, 157 (4th Cir. 2012). Put differently, the duty and ability to supplement "does not permit a party to make an end-run around the normal timetable for conducting discovery." *Colony Apartments v. Abacus Project Mgmt., Inc.*, 197 F. App'x 217, 231 (4th Cir. 2006); *see also East West, LLC v. Rahman*, 2012 WL 4105129, at *6 (E.D. Va. 2012) (quoting *Abacus*). Rather, supplementation is "only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005); *Disney Enters.*, 923 F. Supp. 2d at 795 (describing examples of "true supplementation" as "correcting inadvertent errors or omissions").

Under such circumstances, the court must determine whether the nondisclosure was substantially justified or harmless. If the nondisclosure was substantially justified or harmless, then no action is required by the court. Fed. R. Civ. P. 37(c). If the nondisclosure was not substantially justified or harmless, then the plaintiff may not be allowed to use the witness or the information, or the court may impose "other appropriate sanctions" in addition to, or instead of, exclusion. *Id*.

The court notes that there is some disagreement as to whether Rule 37(c) or Rule 16(f) is the proper vehicle for imposing sanctions if a party fails to disclose a witness or expert opinions in accordance with a deadline set forth in a scheduling order. *See United States v. Thompson*, No. 7:14-cv-92, 2015 WL 2412249, at *4 & n. 4–6 (W.D. Va. May 21, 2005). The court thinks, however, that the issue of sanctions is better analyzed under Rule 16(f) when, at the time of a

8

disclosure violation, there is a court-approved discovery plan in place. As the court has previously explained,

> [w]hen a dispute arises concerning violation of expert disclosure obligations pursuant to a court approved discovery plan, the Court should first look to Rule 16(f) for determining both compliance and sanctions as opposed to Rule 37(c). Rule 16(f) specifically speaks to noncompliance with a scheduling or pretrial order. Rule 37(c), on the other hand, is self-executing and will likely come into play later in the court proceedings, often at or near trial. It serves the situation where there is no discovery plan and the timing of the parties' disclosures is controlled only by the Federal Rules of Civil Procedure.

*Scott v. Holz-Her, U.S., Inc.*, No. 6:04-cv-68, 2007 WL 3171937, at *1 (W.D. Va. Oct. 26, 2007) (alteration in original) (quoting *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 309 (M.D.N.C. 2002)); *accord Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, No. 1:03-cv-537, 2005 WL 6043276, at *2 (M.D.N.C. July 7, 2005); *Luma Corp. v. Stryker Corp.*, 226 F.R.D. 536, 544 (S.D.W. Va. 2005). Thus, this court applies Rule 16(f) and its test in evaluating the propriety of sanctions in this case for any disclosure violation.[2]

Under Rule 16(f), a district court "has wide latitude in imposing sanctions on parties who fail to comply with pretrial orders and procedures." *World Wide Demil, LLC v. Nammo*, 51 F. App'x 403, 407 n.4 (4th Cir. 2002) (citing *Rambus Inc. v. Infineon Techs., A.G.*, 145 F. Supp. 2d 721, 736 (E.D. Va. 2001)). And it enjoys "considerable discretion in determining whether to permit an expert, who is designated after the scheduling order deadline for doing so, to testify." *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 377 (D. Md. 1999) (citations omitted).

In deciding whether to impose sanctions under Rule 16(f), a district court considers the

---

[2] Though the court chooses to apply Rule 16(f) here, it would nevertheless reach the same result if it were to apply Rule 37(c) instead, since "the test for both rules is substantially the same." *Scott*, 2007 WL 317937, at *2. Indeed, because of the similarity between the two rules and their tests, another district court within the Fourth Circuit noted that it did not "need [to] definitely determine which rule(s) and test(s) is/are appropriately applied" in deciding whether to impose sanctions for a party's untimely witness disclosure. *United States v. Cochran*, No. 4:12-CV-220-FL, 2014 WL 347426, at *7 n.2 (E.D.N.C. Jan. 30, 2014).

following four factors: "(1) the reason for failing to name the witness [or failing to disclose the opinions in a timely manner]; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Scott*, 2007 WL 3171937, at *2(alteration in original) (quoting *Rambus*, 145 F. Supp. 2d 736).

**B. MVP's Motion to Exclude Gruelle's Second Expert Report**

MVP moves to exclude Gruelle's second expert report as untimely filed and asserts that it is a new report with many new opinions. The report was disclosed on June 12, 2020, more than forty days after the deadline for initial expert disclosures. (Dkt. No. 5.) Defendants maintain that Gruelle's second report should be considered a timely supplemental report. *See* Fed. R. Civ. P. 26(e)(2).

As noted above, Gruelle's first report found the highest and best use of the entire property before the taking is as a wind farm and after the taking is as a family subdivision. In that report, he was mistaken and believed that the pipeline made the property incompatible for use as a wind farm. If Gruelle had merely corrected this mistaken impression, any supplemental report would show no damage to the property because the use of the property as a wind farm could remain despite the pipeline.

Instead, the second report contains several opinions that are entirely new and different from his first report. The primary change is Gruelle's opinion that the property has two separate highest and best uses before and after the taking. This is a new opinion. He now values these portions of the property separately and combines those values and damages to reach his total. The highest and best use of the northern portion of the property remains as a wind farm before the taking and changes from a family subdivision to a wind farm after the taking. This opinion is consistent with a supplemental report that corrects an error. The highest and best use of the southern portion of the

property has now changed from a pre-taking use as a wind farm to both a pre-taking and post-taking use as a family subdivision. This is a new opinion.

Gruelle's second report also includes additional new opinions. He opines that the northern portion of the property can be accessed as a wind farm by a fire road on another parcel of property owned solely by Elizabeth Terry, one of the co-owners of the property at issue. He opines that the southern portion of the property now has a higher pre-taking value per acre. He contradicts his first report and opines that the improvements on the southern portion of the property are not helpful to a wind farm on the northern portion of the property, so they should not be used for wind farm purposes. Finally, he opines that there is an HCA on the property and calculates damages for that.

The court agrees with defendants that they had a duty to supplement Gruelle's initial report when he discovered the error and that a failure to do so could result in sanctions. However, it is well-established that supplementation cannot be used to give new expert opinions. *See Webber v. Virmani*, No. 5:18-cv-0042-EKD, 2019 WL 1030546, at *3 (W.D. Va. Mar. 4, 2019) ("[S]upplementation is appropriate to 'add or correct information,' but a party may not use Rule 26(e) supplementation 'whenever [it] wants to bolster or submit additional expert opinions' or it would 'amount to unlimited expert opinion preparation.'") (quoting *Campbell v. United States*, 470 F. App'x at 157).

At the hearing, defendants maintained their position that the second report was merely supplemental and asserted that, if the court found otherwise, that the disclosure was substantially justified or harmless. Therefore, the court must analyze whether Gruelle's second report should be excluded due to defendants' failure to obey the court's scheduling order. As noted above, the court analyzes a variety of factors, including the importance of the evidence, the reason for the failure to disclose, and the potential prejudice in allowing the testimony. *See Scott*, 2007 WL 3171937, at *2

11

*see also Thompson*, 2015 WL 2412249, at *4 (listing similar factors).

Regarding defendants' explanation for the failure to disclose, nothing prevented Gruelle, before the filing of his timely initial report, from (1) investigating whether the pipeline would prevent use of the property as a wind farm, or (2) opining that the highest and best use of the southern portion of the subject property before the take was as a family subdivision.

Defendants argue that COVID-19 prevented Gruelle from conducting "meaningful" appraisal work, but the only difficulty defendants mention related to COVID-19 was Gruelle's initial difficulty with entry to his office. There is no explanation, by Gruelle[3] or defendants, as to how entry to his office was required to contact defendants or Invenergy. Indeed, the information provided to the court regarding difficulties in contacting Invenergy are completely unrelated to COVID-19. Defendants mention that Invenergy was moving its offices to another state and that some employees had left the company and were reluctant to speak on behalf of the company under those circumstances. There was also mention of reluctance to speak without permission of Invenergy counsel. None of these reasons are related to COVID 19. Indeed, it appeared from argument at the hearing that Gruelle was relying on intuition rather than facts when he surmised that a wind farm was incompatible with a pipeline and that defendant Frank Terry shared with him his thought that the reason for Invenergy's termination of its interest in the property might be unrelated to the pipeline. Moreover, at no time did the defendants move for an extension of the disclosure deadlines in the court's scheduling order to accommodate the lack of facts and alleged difficulties experienced by Gruelle. Therefore, Gruelle's failure to timely disclose the opinions set forth in his second expert report was not substantially justified.

MVP does not dispute the importance of Gruelle's testimony to defendants' case, and the

---

[3] At the hearing, the court denied defendants' motion for leave to submit a declaration.

court recognizes the importance of the testimony.  Without the second report, defendants are left with Gruelle's initial report and the contemplated testimony of one of the landowners.  However, MVP is clearly prejudiced by the untimely disclosure of Gruelle's opinions, and it is not harmless.  The report was disclosed on the final day for expert discovery, and MVP had already expended substantial resources responding to defendants' initial expert disclosures with a rebuttal report of its own expert.  Indeed, defendants further contributed to the prejudice to MVP by failing to disclose Gruelle's error in a timely manner.  Gruelle discovered the error on or about May 8, before MVP filed its expert rebuttal report on May 29, but defendants did not notify MVP and filed Gruelle's new report until June 12, the day discovery closed.  Defendants' offer to make Gruelle available for a deposition—resulting in further expense for MVP—does not cure the prejudice.  *See Mountain Valley Pipeline, LLC v. 1.30 Acres (Baker)*, 7:18-cv-0607, 2019 WL 4306981, at *6 (W.D. Va. Sept. 11, 2019) (noting that defendants' offer to make Mr. Baker available for deposition did not cure the prejudice because MVP would not have the opportunity to file rebuttal opinions and evidence).  Nor would a continuance cure the prejudice to MVP.  The court also notes that this case is set for trial on September 8, 2020.  For these reasons, the court finds that excluding Gruelle's second report is a justified sanction, and it will do so.  Because of this finding, the court will not address the additional arguments made by MVP to exclude certain of the new opinions because they were unreliable.

**C.  MVP's Motion in Limine**

### 1. Evidence of fear and stigma of pipelines and claims that buyers would not purchase the Property because of the Pipeline

Because Gruelle has not linked fear of pipelines to a diminution of value, evidence of fear is inadmissible.  *See MVP v. 1.85 Acres (Lucki)*, Civil Action No. 7:19-cv-00147, 2020 WL 1067001, at *6 (W.D. Va. Mar. 5, 2020).  As to claims that buyers would not purchase the property, this

opinion is similar to the one given in *Lucki* that was excluded because "anecdotal conversations relating to various fears or perceptions, without foundation, are entirely insufficient as a basis for expert testimony." *Id.* Moreover, Gruelle provides no link to diminution in market value. *Id.*

Defendants also seek to introduce evidence of HUD's lending requirements for improvements within 660 feet of the pipeline. Once again, Gruelle provides no link to diminution in value.

For these reasons, evidence of fear and stigma and claims that buyers would not purchase the property because of the pipeline are excluded.

### 2. Claims that the Pipeline is dangerous or unsafe, evidence of other pipeline accidents or incidents

For similar reasons, the court has also excluded this type of evidence, and will do so again in this case. *Baker*, 2019 WL 4306981, at *5 (excluding evidence about HCAs and the potential impact radius of an explosion area in the event of a pipeline rupture because there is no "evidence that any hazard is reasonably probable and there is no causal link between any hazard, or perception thereof, and a diminution in value of the property"); *MVP v. 1.81 Acres (Jones)*, Civil Action No. 7:19-cv-00151, 2019 WL 3945272, at *5 (W.D. Va. Aug. 21, 2019) (excluding testimony because "an expert's opinions with regard to some hazard incident to the use of the property taken must be supported by some evidence that the hazards are reasonably probable and more than just speculative. Moreover, there must be a nexus between those hazards and/or the public perception in the marketplace . . . and a diminution in value of the property").

Defendants wish to introduce evidence of pipeline markers on the property. MVP does not object to evidence that there will be pipeline markers on the property, but MVP does object to evidence of any statements or warnings on the markers. Gruelle mentions the pipeline markers only once in his report. (Dkt. No. 13-1 at 36.) Gruelle does not describe the statements or warnings on

14

the markers, nor does he attempt to establish a link between the markers and an actual diminution in value.

The court will reserve ruling on the issue of statements on the markers for trial. Subject to that exception, the court will grant MVP's motion to exclude claims that the pipeline is dangerous or unsafe and evidence of other pipeline accidents or incidents.

### 3. Evidence of alleged impacts and hazards from construction

This motion is directed to alleged impacts to the remainder of the property from construction and temporary impacts associated with construction. Thus, MVP moves to exclude Gruelle's statement that a creek on the property "is subject to denigration according to Dr. Pamela Dodds." (Dkt. No. 13-1 at 38.) This evidence is excluded because possible impacts and hazards are not inherent in the easement. *See Lucki*, 2020 WL 1067001, at *7 (excluding evidence of uncertain impact to springs, wells, drainage, and soil compaction because compensable loss in eminent domain proceedings is limited to risks that are inherent in the easement). MVP agrees that defendants can recover for any permanent impact to the land within the easement that results from construction. MVP's motion will be granted to the extent it concerns impacts and hazards from construction outside the easement.

### 4. Evidence of other appraisals

Gruelle cites an appraisal prepared by Jared Schweitzer to estimate security for defendants' property. MVP recognizes the court's holding in *Lucki* that an appraisal for security is not necessarily inadmissible and reserves its position. *See Lucki*, 2020 WL 1067001, at *7–8. Instead, MVP argues that the appraisal should be excluded as inadmissible hearsay.

Defendants do not contest that the appraisal is hearsay, but they argue that the security estimate should be admissible as a party admission. Expert opinions are not considered party

15

admissions. *See Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir. 1995) ("Because an expert witness is charged with the duty of giving *his* or *her* expert *opinion* regarding the matter before the court, we fail to comprehend how an expert witness, who is not an agent of the party who called him, can be authorized to make an admission for that party.") (emphasis in original); *Wilson v. Hartford Ins. Co.*, No. 2:10-cv-993, 2011 WL 2670199, at *2 (W.D. Wash. July 7, 2011) ("Mr. Wilson is mistaken in his belief that a party's expert report is equivalent to a party's admission within the meaning of Fed. R. Evid. 801(d)(2). An expert is expected to form her own opinions, not the opinions of the party who hired her."). *United States v. 320.0 Acres*, 605 F.2d 762 (5th Cir. 1979), cited by defendants, is distinguishable. In *320.0 Acres*, the Fifth Circuit held that statements of just compensation provided by federal agencies to landowners pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act (Uniform Act) are admissible in condemnation proceedings as a party admission. 605 F.2d at 822–25. The Fourth Circuit has held to the contrary. *Washington Metro. Area Transit Auth. v. One Parcel of Land*, 548 F.2d 1130, 1131 (4th Cir. 1977). In any event, the Uniform Act does not apply in this case.

     Further, Rule 703 of the Federal Rules of Evidence allows an expert to base his opinion on facts or data that experts in the field would reasonably rely upon, but the expert must have actually based his opinion on the facts or data in question. Gruelle based his opinion on comparable sales resulting in his conclusion that the subject property was damaged in an amount greater than that found in the Schweitzer appraisal.

     Finally, the court will reserve ruling on whether the Schweitzer appraisal can be used as impeachment at trial.

     For these reasons, MVP's motion to exclude evidence of other appraisals will be granted.

### 5. Evidence of possible utility corridor

Defendants argue that evidence the property may be considered for future projects is relevant to value. The possibility of such use is speculative, and Gruelle has no evidence linking it to market value. *See Baker*, 2019 WL 4306981, at *6 (excluding evidence of utility corridors when the speculative nature of the testimony was conceded). If such a taking occurs in the future, the company taking the easement will be responsible for just compensation. Thus, this portion of the motion will be granted.

### 6. Examination of Joseph E. Thompson concerning vacated order

Defendants do not oppose this portion of the motion, so it is granted by agreement.

### 7. Evidence of settlement offers and communications

Defendants do not oppose this portion of the motion, so it is granted by agreement.

### 8. Evidence of amounts paid for easements on other properties

Defendants do not oppose this portion of the motion, so it is granted by agreement.

### III. CONCLUSION

For the reasons stated herein, defendants' motion for leave to file supplemental materials (Dkt. No. 26) regarding MVP's motion in limine is GRANTED, MVP's motion to exclude experts (Dkt. No. 12) is DISMISSED as moot, MVP's motion to exclude testimony by Gruelle based on his new report (Dkt. No. 13) is GRANTED, and MVP's motion in limine (Dkt. No. 14) is GRANTED in part and DENIED in part.

Entered: August 18, 2020.

/s/ Elizabeth K. Dillon
    Elizabeth K. Dillon
    United States District Judge